UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                    CASE NO. 8:25-cr-299-WFJ-NHA

LEO JOSEPH GOVONI and
JOHN LEO WITECK

**MEMORANDUM IN SUPPORT OF GOVERNMENT'S
MOTION FOR HEIGHTENED BOND CONDITIONS
FOR DEFENDANT GOVONI**

Defendant Leo Joseph Govoni presents a substantial risk of flight. *See* 18

U.S.C. 3142(c)(1). Accordingly, at this afternoon's initial appearance and bond

hearing in the above-captioned case, the United States of America intends to orally

move for heightened bond conditions to ensure Govoni's appearance at future court

proceedings. *See* 18 U.S.C. § 3142(c)(1)(B). The government provides this

memorandum in support and as notice to the Court of facts it may wish to consider.

As described further below, Govoni's offenses were heinous, predatory, and

devastating: over the course of fifteen years, he embezzled over $100 million from

special needs victims who entrusted their money to him, mostly children and/or

people with mental or physical disabilities, leaving many of them struggling

financially. *See* 18 U.S.C. § 3142(g)(1). He did so by stealing from the non-profit he

co-founded: the Center for Special Needs Trust Administration ("CSNT"). He

victimized hundreds, if not thousands, of people, most of whom are among society's

most vulnerable. And there is a mountain of evidence against him. *See* 18 U.S.C. §

3142(g)(2).[1] Consequently, the grand jury indicted Govoni on fifteen charges, with the top charge carrying a maximum sentence of thirty years in prison. Given the likelihood he will be convicted and the lengthy prison term he faces, Govoni has a substantial motivation to flee. He is also believed to have access to the financial means to do so, as well as to potentially have access to a private plane. Accordingly, the government will respectfully request that—in addition to the standard conditions of release—the Court impose a secured bond of *at least* $1 million, restrict Govoni to travel within the Middle District of Florida, require him to surrender his passport, prohibit him from contacting co-defendant John Leo Witeck and other current or former employees of the Govoni Entities[2] about the issues in the case, and mandate that Govoni submit to location monitoring via whatever method Pre-Trial Services deems appropriate.[3] These are the least restrictive bond conditions that will reasonably assure Govoni's appearance at future court proceedings. *See* 18 U.S.C. § 3142(c)(1)(B).

---

[1] The government will orally address the remaining 18 U.S.C. § 3142 factors, particularly Govoni's personal history and characteristics, after reviewing the Pre-Trial Services report at the bond hearing.

[2] The Govoni Entities consist of the following corporations: CSNT, Boston Finance Group, LLC ("BFG"), Boston Asset Management, Inc. ("BAM"), Fiduciary Tax & Accounting Services, LLC ("FTAS"), Austin Colby Co. ("ACC"), Broadleaf Properties, LLC, Artspace Properties, LLC, BCL Aviation, LLC, Big Storm Breweries, Big Storm Canteen, LLC, Big Storm Coffee, LLC, Big Storm Creamery, LLC, Old Line Keg Manufacturing, Big Storm Real Estate, LLC, Global Litigation Consultants, LLC ("GLC"), the Center for Litigation Support ("CLS"), Seaboard Manufacturing, Boston Settlement Group, LLC ("BSG"), and Boston Holding Company, LLC ("BHC").

[3] The government may seek additional conditions once it has had the opportunity to review the assessment by Pre-Trial Services.

## I.    Background

CSNT was intended to help society's most vulnerable by protecting their money, while still enabling them to obtain government assistance.

Many government assistance programs, such as Medicaid and Supplemental Security Income ("SSI") are means-tested, meaning that in order for a person to receive benefits, that person's income must be below a certain financial threshold. Sometimes, people who receive and rely on Medicaid, SSI, or other means-tested government assistance receive an influx of money, such as from a settlement from a lawsuit, a court award for damages, an insurance payment, and/or a government program award. (For example, this is a common occurrence for many people with mental and/or physical disabilities caused by accidents, such as medical malpractice or car crashes, who often receive financial compensation to address the cause and results of their disabilities.)

Such people may nevertheless *remain* financially eligible for means-tested government assistance, such as Medicaid and SSI, if they put assets into a special needs trust ("SNT"). By law, the government does not consider assets contained within SNTs when evaluating a person's financial eligibility for means-tested assistance programs like Medicaid and SSI. *See* 42 U.S.C. § 1396p. Thus, such people can place their assets into SNTs, receive periodic trust disbursements to cover certain authorized expenses, like housing, transportation, and medical care, and still remain financially eligible for Medicaid, SSI, and/or other government assistance

## II.    Nature and Circumstances of the Offenses

In 2000, Govoni co-founded CSNT as a 501(c)(3) non-profit based in St. Petersburg, Florida. Ostensibly, Govoni created CSNT to establish, administer, and manage irrevocable SNTs and other trusts to benefit people with mental and/or physical disabilities and other Medicaid and/or SSI recipients, including many children. In other words, CSNT's clients were some of society's most vulnerable people.

Govoni was highly successful at recruiting clients and CSNT grew rapidly. Between 2009 and 2024, CSNT managed funds for more than 5,000 distinct beneficiaries. As of February 2024, CSNT managed over 2,100 SNTs. These trusts *should* have contained *more than* $100 million. They didn't, however, because Govoni embezzled that money.

He promised his client-victims that he would protect and invest their money, acting with their best interests at heart, so that when they needed it, their money would be there for them. Govoni's victims and their caretakers believed him, and they entrusted their money to him. They thought their money was safe because Govoni, and later co-defendant John Witeck (who began working with Govoni in 2014 as an accountant) too, told them it was safe and would continue to be so. Govoni's victims and their caretakers thought their money would be there to help pay for their basic needs—like medical, housing, and transportation expenses—for the rest of their lives because Govoni and Witeck told them that, too. They lied. What Govoni's clients didn't know, what they *couldn't* know, was that he was the

proverbial fox guarding the henhouse.

In reality, Govoni ran CSNT as the center of a massive fraud scheme involving at least ten other companies he controlled. In short, it was a grift. In 2008, while he was still the Director of CSNT, Govoni established Boston Finance Group, LLC ("BFG") as a financial services company that loaned money to other businesses, including law firms, for profit. In 2009, Govoni arranged for CSNT to issue a $2.5 million line of credit to BFG. The loan was supposed to repaid in 2017, with interest due in the meantime. Later in 2009, Govoni resigned from CSNT's Board of Directors to avoid an on-paper conflict of interest with BFG, yet he remained in control of CSNT. He then arranged in late 2009 for CSNT to increase the loan to BFG to $15 million. In March 2010, he increased it to $30 million. In March 2011, he increased it to $50 million. And in January 2012, he increased it to $100 million, adding a personal guaranty that the loan would be repaid. It never was.

Govoni treated CSNT like a $100 million piggy bank. Generally, when clients entrusted money to Govoni and CSNT, the non-profit would take a cut of that money for operating expenses, establish a SNT for the designated beneficiary, assess the beneficiary's expected expenses, set aside some funds to hold in cash to cover those expenses for a period of time, and tell the client-beneficiary that the rest of the money would be "invested." Most of it wasn't.

Govoni arranged for the majority of the "invested" money to be transferred to two companies he controlled: BFG and Boston Asset Management, Inc. ("BAM"). BFG was a black box to CSNT's client-beneficiaries. Govoni, Witeck, and their co-

conspirators told client-beneficiaries that the money had been "invested," including in fraudulent annual statements that they arranged to be mailed to them, but client-beneficiaries were not provided any meaningful detail on *how* the money had been "invested." In fact, the vast majority of it *wasn't* invested. It was used to fund Govoni and Witeck's other business ventures, line their pockets, and enrich their co-conspirators. The below graphic, Figure 1, broadly summarizes the fraud scheme.



*Figure 1: Flowchart illustrating the flow of money in the fraud scheme*

Govoni used CSNT assets controlled by BFG as a personal slush fund. As a regular practice, he—and later, co-conspirators—would direct employees to pull money from CSNT and transfer it to BFG. CSNT employees would then identify trusts with "excess" cash—meaning more cash in the account than upcoming/short-term projected expenses (*i.e.* "excess" from Govoni's perspective but not from the client-beneficiaries')—and transfer funds to BFG. From there, Govoni would arrange

for BFG to distribute the CSNT-derived funds to enrich himself and his co-conspirators. Often the victims' money was sent to other companies Govoni controlled in order to cover their payrolls and bills. (For example, Govoni owned a brewery and restaurant, Big Storm Brewery, which his son operated and managed. Govoni often paid Big Storm Brewery's overhead expenses with CSNT client-beneficiaries' money.) None of these transactions provided CSNT's client-beneficiaries with equity in Govoni's companies or other means of growing their money. In other instances, Govoni used his victims' money to live a lavish life, complete with luxury boxes at Tampa Bay Buccaneers games and the Kentucky Derby, pay off his own home mortgage, enable his use of private planes, and cover the living expenses of his friends and family. He even distributed some of his victims' money directly into his own personal bank account. In short, he did not "invest" his CSNT client-victims' money; he embezzled it.

The below flowchart, Figure 2, summarizes how the embezzlement process worked.



*Figure 2: Flowchart illustrating the process Govoni used to embezzle money from clients*

Govoni and BFG never repaid the principal of the $100 million "loan" from CSNT, and they only periodically—and inconsistently—made interest payments. On multiple occasions, those periodic interest payments also served as a vehicle for Govoni and Witeck to launder money embezzled from CSNT. They would arrange for CSNT to send money to Fiduciary Tax & Accounting Services, LLC, a financial services firm co-owned by Govoni and Witeck, transfer that same money to BFG, and then *return* the money to CSNT, albeit now designated as an "interest payment" on the loan.

Govoni repeated these practices for over fifteen years, defrauding hundreds, if not thousands, of special needs victims out of millions of dollars that these exceptionally vulnerable people depended on to pay for their basic needs. Over the course of those fifteen years, Govoni maintained control over CSNT's operations,directly and through his associates, despite not having an official

leadership position at the non-profit. Everyone knew Govoni was in charge, and that he was responsible for major decisions, including the distribution of funds. He maintained that control via a variety of tactics, including intimidation (such as by often displaying and carrying weapons around the office and firing people who questioned him), tightly controlling information, and strategically keeping employees in the dark about key aspects of their jobs.

Nevertheless, in approximately 2022, new leadership took over at CSNT, relegating Govoni to the sidelines. The new managers of CSNT examined its financial records and accounts, ultimately discovered that over $100 million in client-beneficiary funds was missing, and declared bankruptcy. In January 2025, bankruptcy Judge Roberta Colton granted summary judgment for CSNT against Govoni and BFG, finding Govoni and BFG liable for $120,324,391 in losses ($88,065,957 in principal and $32,258,434 in accrued interest). *See* No. 8:24-ap-00139-RCT.

The bankruptcy proceedings are ongoing; they are now in the collection phase. Govoni has testified on multiple occasions. He has also made false written and oral statements during the proceedings, including as recently as May 2025, and has been held in contempt of court for refusing to provide certain documents. He remains intransigent.

The below timeline, Figures 3 and 4, summarizes key dates in this case.



*Figure 3: Partial timeline of key events in the case, part 1 of 2*



*Figure 4: Partial timeline of key events in the case, part 2 of 2*

Due to the above conduct, on June 18, 2025, a grand jury sitting in the Middle District of Florida indicted Govoni and Witeck on one count of conspiracy to commit wire and mail fraud, in violation of 18 U.S.C. § 1349; three counts of mail fraud, in violation of 18 U.S.C. § 1341; six counts of wire fraud, in violation of 18 U.S.C. § 1343; and one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). Govoni is also charged separately with one count of bank fraud, in violation of 18 U.S.C. § 1344; one count of illegal monetary transaction, in violation of 18 U.S.C. § 1957; and one count of making a false bankruptcy declaration, in violation of 18 U.S.C. § 152(3). The bank fraud offense carries a maximum penalty of 30 years in prison. Each count of wire fraud, mail fraud, conspiracy to commit wire and mail fraud, and the money laundering conspiracy offense carries a maximum penalty of 20 years' imprisonment. The illegal monetary transaction count carries a maximum penalty of 10 years in federal prison and the false bankruptcy declaration carries a maximum penalty of 5 years' imprisonment.

The financial scope of Govoni's offenses is enormous: he embezzled over $100 million from hundreds, if not thousands, of victims nationwide. Yet the scope of his offenses is surpassed by the depth of the depravity, greed, and callousness it took for him to commit them. He preyed on people who trusted him. He treated people with mental and physical disabilities as marks. He took advantage of children. He victimized some of the most vulnerable people in society, people who had already suffered unfathomable tragedies and difficulties in their lives. And he did it to feed

his own greed. To make himself and his coconspirators rich, at the expense of people who relied on the money to pay for their basic needs. The nature and circumstances of Govoni's offenses weigh in favor of the heightened bond conditions that the government proposes.

## III.    Weight of the Evidence

The evidence in this case is voluminous and strong. For example, it consists of extensive interviews of Govoni's victims, employees, and associates. It contains copies of mailings sent to victims. It includes corporate bank records from Govoni's and Witeck's businesses, personal bank records of Govoni, Witeck, their co-conspirators, and associates, and business records from Govoni's and Witeck's companies, including internal accounting and communication records. It includes transcripts of Govoni's testimony in the bankruptcy proceeding and the testimonies of Govoni and others in a related civil case filed by one of the victims. And the investigation continues. The strength of the evidence supports the heightened bond conditions that the government proposes.

## IV.    Risk of Flight

Govoni has a powerful motive to flee and the means to do so. The charges are serious and the evidence is compelling. He is 67 years-old and faces the very real prospect of spending the rest of his life in prison. Moreover, while he has claimed in the bankruptcy proceeding that he has scant assets, that claim appears to be false, or at minimum misleading. The government's investigation has shown that Govoni once had, and may still have, access to a private plane. He also effectively controls

considerable assets, even if those assets are in names of family members or friends, and lives in a home valued at over $1 million. For the above reasons, Govoni presents a substantial risk of flight, which the Court should mitigate by imposing the heightened bond conditions proposed by the government.

## V.      Conclusion

For the aforementioned reasons, the United States respectfully requests that—in addition to the standard conditions of release, *see* 18 U.S.C. § 3142(c)(1)(B)—the Court impose a secured bond of *at least* $1 million, restrict Govoni to traveling within the Middle District of Florida, require him to surrender his passport, prohibit him from contacting co-defendant Witeck and other current or former employees of the Govoni Entities about the issues in the case, and mandate that Govoni submit to location monitoring via whatever method Pre-Trial Services deems appropriate.

Respectfully submitted,

GREGORY W. KEHOE
United States Attorney


By:    */s/ Michael M. Gordon*
Michael M. Gordon
Assistant United States Attorney
Florida Bar No. 1026025
400 N. Tampa Street, Suite 3200
Tampa, FL 33602-4798
Telephone: (813) 274-6000
Facsimile: (813) 274-6358
E-mail: michael.gordon3@usdoj.gov

*/s/ Jennifer L. Peresie*
Jennifer L. Peresie
Assistant United States Attorney

13

United States Attorney No. 120
400 N. Tampa Street, Suite 3200
Tampa, FL 33602-4798
Telephone: (813) 274-6000
Facsimile: (813) 274-6358
E-mail: jennifer.peresie@usdoj.gov

**United States v. Govoni, et al.**                    **Case No. 8:25-cr-299-WFJ-NHA**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 23, 2025, I electronically filed the foregoing with the

Clerk of the Court by using the CM/ECF system, which will send a notice of

electronic filing to all counsel of record.

<u>*/s/ Michael M. Gordon*</u>
Michael M. Gordon
Assistant United States Attorney
United States Attorney No. 182
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone:  (813) 274-6000
Facsimile:   (813) 274-6358
E-mail:        michael.gordon3@usdoj.gov